Withers, J.
delivered the opinion of the Court.
The plaintiffs have brought their action against each of the defendants for two instalments, which are demanded of each, in the first count of the process, as a subscriber to the stock of the company; and in the second count the like sum is demanded on agreement to subscribe to the capital stock.
The first inquiry will, therefore, be whether the defendants are stockholders in said company.
The charter, and the report of the Circuit Judge, cannot be incorporated in this opinion; but both ought to be read in ad-vanee, by any one who may be desirous of comprehending properly the grounds upon which our judgment must proceed. It is especially requisite to know that to become a stockholder originally, “for the purpose of raising the capital stock,” as 'the charter has it — books were to be opened by certain commissioners in many places, “ for the purpose of receiving subscription,” “ in shares of a hundred dollars each, to constitute the joint capital stock.” “ On each share of the stock subscribed for, the subscriber shall pay to the commissioners, who shall take the same, the sum of five dollars in specie, or in notes of specie paying banks, the said commissioners giving a receipt or certificate for the same, and on non-payment of said instalment, the subscription shall be void.” This was the authorized, the specific, the exclusive mode. Who could prescribe any other ? The corporation were to be generated by this scheme. If any other could have been substituted, then there was no fixed scheme, and the company might have come into existence illegitimately ; or rather it could never have come into existence at all. In no one particular did these defendants comply with the scheme laid down by the law. They did not subscribe in *248 the books, nor under the superintendence of the commissioners, who alone were authorized to open books and receive subscriptions; nor did they pay any money at any time, though, by the'express terms of the charter, the non-payment of earnest money (so to call it) at the prescribed time, to the prescribed persons, in a settled amount, shall make a subscription void, even if it be formal in all other particulars. They did no more than to .write their names on a loose memorandum, reciting that they agreed to subscribe for the amount of stock specified, provided the road should come to Columbia; this being done, after the charter had been granted, to be sure, but before the books had been opened, and of course before the corporation, that is the plaintiffs, had an existence.
It seems impossible to read the charter without perceiving, at every step, the strongest contradiction to the idea that these defendants can be, or ought to be, regarded as stockholders.
If they are stockholders, then every body else pursuing the like course would be invested with the same character. Conceive the idea that every one now holding a place in the company, had pursued the same course — what sort of a Rail Road corporation should we have had ? Could a single power, specified in the charter, have vested in such a body of individuals? No permanent record of an assumption, no assumption at all to those nominated by law to enter into the contract on behalf of the corporation in fieri, not only no specie or its equivalent, but not a cent of money paid, not one act done, nor one pledge given and ratified in manner or substance as required by law — how can it be pretended that, under the circumstances supposed, a single man would have filled the character of a stockholder or corporator ? Such a body would have borne as close a relation to the charter, as a self-constituted mob would bear to lawful government — the subscriptions being about as efficacious and solid as the rhetorical promises one might proclaim in a town meeting, called to generate enthusiasm.
In proper proceedings to vacate a charter, where all who called themselves corporators Stood on the footing of these defendants, it would seem obvious that a very feeble resistance could be made to the attack — and a good deal of difficulty might be encountered, in the way of individual liability, if an organization of such corporators should endeavor to exercise, and to enforce upon others, the numerous and important powers granted in the charter.
A contingency is contemplated by the charter, which is of this kind: that at the expiration of the time of receiving subscriptions, in the first instance, a less sum than $300,000 might be subscribed for, in which case the books were to be *249 re-opened, that amount of stock being a sine qua non to the existence of tiie corporation. Now supposing the occasion present when the question arises whether the books are to be re-opened — how is the fact to be ascertained that the requisite amount has not been subscribed for 1 It is plain that the books alone can be resorted to. Who would imagine that a loose memorandum, such as that which is made the foundation of this action, could be consulted ? And even the books should be purged of such spurious subscriptions as had not been ratified by the payment of five dollars per share to the commissioners, at the time of subscribing ; in default whereof such subscriptions are declared to be void.
The paper produced shows an agreement to subscribe, (it is nothing more;) an agreement coupled with a proviso. It is by parol, in the legal sense, and in contemplation of law can claim no more dignity, nor impose a higher obligation, than a mere verbal promise of the same import. It is the same, then, as if these defendants had used the like words in conversation with any or all those who have joined them in subscribing the paper referred to. Can any man read the charter, and say that a stockholder of the Charlotte and S. C. Rail Road Company can be constituted such by an observation equivalent to that relied upon in these cases ? It is enough to ask the question, and the answer is imported in itself.
But it is said that the payment of the money, required on subscribing, is an affair to be exacted or dispensed with by the plaintiffs in these actions ; and that whether the one or the other shall be resolved upon,- the man may be yet held a member, a stockholder, in the corporation. Of course the company might claim the same convenient attribute, in relation to any other inconvenient requisite, prescribed in the charter. This is founded on the idea, that as these were prescribed for the benefit of the company, so may they, who were to be protected, dispense with all that was intended for their security and advantage.
To this species of argument, it is believed that answers entirely conclusive may be rendered, over and above an obvious one, (in itself very strong,) that the law is otherwise written — the fundamental law of the company ; and that it must not come into being by a process so much at war with the conditions of its being, as to amount to a sort of patricide, a war of the -creature against the source of its creation. There was no company in existence, to exercise the discretion claimed when the act was to be performed that was to make a stockholder. The manner and form of clothing a man. with that character, was clearly delineated with respect to particulars of essence. He was or was not to be a stockholder at a certain time, ex vi termini. Nor could there ever *250 have been a corporation, if all had behaved as the defendants [lave. When the charter was passed, there was not a stockholder in existence ; nor was there a company to own stock $300,000 were subscribed for lawfully.
2. It is a very great mistake to suppose that the requisites to make one a stockholder, prescribed in the charter, were prescriptions for the peculiar advantage of those who are now plaintiffs. Has the public at large no interest in these matters ? Are franchises, such as this corporation enjoy, conferred for the exclusive benefit of corporators ? Who would not be startled at a mode of constituting a stockholder, in a bank, in imitation of that according to which these defendants are claimed to be such in this corporation ? Are not this company empowered to contract on a large scale ? Could the Legislature ever have intended that the officers of the corporation should enter on such a career as the representatives of men of straw; stockholders in all else except the matter of subscribing, when, where, and in manner, as directed by law; and except also the payment of the money imperiously required likewise by the charter ?
3. But, in addition, there was a peculiar reason that claimed a faithful compliance with the charter in the matters of subscribing and paying. There was, in a very material preliminary matter, a rivalry not only contemplated but directed, between real and bona fide stockholders (men who had rendered the earnest money,) in different sections of the State, as to the location of this road, and the position of one of its termini. These very important results were to follow the resolution of a problem, and the ratio thereby obtained; the elements of that problem were “ the amount (of stock) subscribed for, reference being had to the cost of constructing the said road, by the one route or the other.” In ascertaining this result, can it be conceived that a promise to subscribe for stock, should be counted as stock subscribed for? that the dispensing power, which we are now considering, should be used by either of the rival parties, or on their behalf, to palm off .on the othér, as an element in an arithmetical calculation, one as a subscriber who never did subscribe, and that as stock which has not the first characteristic of stock? Surely such a power,in matters of great moment, never can be derived from such subscribers as these defendants. If, while the location of the road was pending, the commissioners, representing .either of the rival parties, had executed receipts for the payment of the $5 required at the time of subscription, when that payment was not made at all, and the subscriber was known to be insolvent, in order that the weight of such subscription should be felt in settling the location of the road, who will hesitate to pronounce that such conduct would have made mere fictitious stockholders ? that it would have been a fraud upon the *251 other party, if that party acted up to the law, and a palpable breach of the charter in vital particulars 1 But in these cases, so far as we hear, there is not even the flimsy guise of a false receipt. . . . , .. . ,
Kidwelly Canal T> Ra' ey' '
It there had been a provision in the charter subjecting the private estate of a stockholder to liability for the debts of the corporation (which to some extent is sometimes found in Bank charters) it is not conceivable that a creditor could have enforced a recovery against Blakely and Drafts. They might triumphantly have pointed to the charter and to the books of subscription, and have demanded where and how they had incurred any liabilities or acquired any rights as stockholders in this corporation, and have successfully denied that a creditor could, from any thing they had done, have any reason to suppose they were stockholders.
As already suggested, before the company could have a corporate existence it was necessary that the sum of $300,000 should be subscribed for. Now suppose the State had instituted proceedings to ascertain whether this condition had been complied with, it cannot be pretended that the paper here produced would have been allowed the weight of a feather in the calculation.
The view which the plaintiffs have presented to the Court does not derive any support from the case found in 2 Price, p. 93. Raley had signed his name for three shares of £,100 each to a paper disclosing the following terms; “ A list of subscribers to a fund for carrying into execution a plan for the improvement of the harbor of Kidwelly, and making proper communications therewith from the several collieries in the neighborhood, by a canal or rail-roads.” The defendant had been one of the original subscribers to the first proposals of meeting for the purpose of effecting the objects of the company, and to the intended measure of an Act of Parliament as the foundation of the undertaking. The Act was obtained. Before that time Raley had attended various meetings as chairman and had in fact taken an active part. But while the Act was in progress he desired that his name should not be inserted in the bill (disapproving, as he then did, of the proceeding) and accordingly his name was omitted in the Act reported by the committee. Afterwards he attended a meeting and seconded a motion for the appointment of a Clerk, and it appeared that he had obtained from one Brogden what one of the Judges called a “ fictitious assignment” of three shares of stock, to which Raley would have traced his participation in the last meeting he attended. It was indeed held by the Court, and an able Court, that Raley could not withdraw; nor do we think this Court would decide otherwise in such a case. To shew, however, how far it is removed from the cases now before us, it will be sufficient to *252 note a few of the particulars set forth by the Judges, who delivered their opinions seriatim. It was said that the Act of Parliament, though it did not contain Raley’s name, yet it did not expressly exclude it (which was held to be necessary to gain exemption by virtue of the Act) but that it incorporated all who had subscribed or might thereafter become pos-gesse¿ 0f shares. “ On being passed (said Ch. Baron Thompson) it had reference to every person who had before that time subscribed, without rejecting any, and they then became entitled to profits.” It was regarded as obvious that there was no power in the committee, who had charge of the Act, to consent to the withdrawal of Raley so as to bind his colleagues, and that he answered the description of persons enumerated in the Act — the words being, “■ those who have subscribed or may hereafter subscribe.” Another part of the Act described those liable to calls as “ every person or persons who hath or have already subscribed.” If there be any thing in the suggestion made to us that the subscription of the defendants to the memorandum produced in the present cases, should have reference to the charter, because it rvas made after it passed, it may be met by the circumstance in thejiase cited for the plaintiffs, that Raley subscribed with direct reference to securing an Act of Parliament as the “ foundation of the undertaking,” and yet that fact was not alluded to as having any thing to do with fixing his liability. The Act of Parliament alone was looked to, and its provisions prescribed the law of the case. It cannot be necessary to add more to establish that the case cited does not help the plaintiffs here. If these defendants had ever been in, as Raley was, then indeed we might hold, as was held by the Court of Exchequer, that they could not withdraw without consent of their associates.
If instead of a liability to pay, the question had been a title to receive dividends, it is presumed the corporation could adduce an unanswerable argument to estop the defendants from a participation in gains.
It must be taken, therefore, that the defendants are not stockholders.
The question remains whether the plaintiffs can recover on the count alleging an agreement to take stock. We must resolve this against the plaintiffs also. Not only was the promise not made to them, but they were not in existence when it was made. Nor does the evidence shew that it was made to any one acting as the agents of the plaintiffs; none could act for their benefit but the commissioners called into existence by the charter, and not authorized to receive such a promise.
Nor are we able to discover the consideration necessary to sustain such promise as proceeding from any quarter. If *253 these defendants had died before the books were opened, could the promise in question have possibly been enforced against their representatives 1 It could if a valid Yet it does seem impossible to give it such force and effect.
Moreover, if these parties are liable on this footing, it is a liability independent of the charter, as has been shewn in the discussion of the question growing out of the first count. Yet they are sued for such liabilities as the charter imposes — and this count also is engrafted upon the charter; for instalments are called for, and not damages demanded for the non-performance of a contract. The second count does, to all intents and purposes, treat the defendants as stockholders, which character, for benefit or liability, we have shewn they cannot bear.
A very similar engagement to that before us was made by Brinkerhoff in reference to the Utica and Schenectady Rail Road, the great difference against these plaintiffs being that in the case referred to there was an existing company with whom to contract. In that case we learn a promise was made by Brinkerhoff to the rail road company, in writing, that if they would so locate their road in Utica so as to require certain lands at the terminus of it, for the purposes of the road, he would, in consideration of the benefits to accrue to him by such location, pay the price of the land so needed at the terminus. The averment was made that the road was so located. But the Court held that it was no valid contract— that it in fact was no contract at all — the rail road company were not bound to do any thing; there was no mutual obligation at the same time — that the paper declared on was in fact merely a proposal.
We are conducted to the conclusion that these plaintiffs in this action are not entitled to recover what they claim from these defendants. Whether these plaintiffs can recover any thing in any other form of the defendants, or in any other jurisdiction--or whether any body can shew from their conduct cause for action on the case, or equity warranting redress, are matters foreign to the questions before us, and are in no wise considered.
The motion is dismissed.
Richardson, J. — Evans, J. — and Frost, J. — concurred.
O’Neall, J. did not hear this case.

Motion refused.